Filed 4/20/15  In re C.A. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re C.A. et al., Persons Coming Under the Juvenile Court Law. | C076721 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. Nos. 10JVSQ2770202, 10JVSQ2770302, 10JVSQ2851301) |
| Plaintiff and Respondent, | |
| v. | |
| J.A., | |
| Defendant and Appellant. | |

Jessica A., mother of the minors,[1] appeals from orders terminating her parental

rights.  (Welf. & Inst. Code, §§ 366.26, 395.)[2]  Mother re-asserts challenges previously

---

[1] Mother has six children, B.C., C.A., S.A., L.A., A.A., and An.A., who are referred to in reports and orders in the record.  The appeal relates to only three of these children, C.A.,

1

made in her petition for extraordinary writ filed after disposition orders on a section 387 petition removing the minors from her custody and terminating her family maintenance services. The petition was summarily denied on the merits, preserving mother's revival in this appeal of the issues previously tendered. (*Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501, 1513 (*Joyce G.*).) Mother also argues insufficient evidence supports the juvenile court's findings sustaining the four allegations ultimately contained in the section 387 petition that: 1) mother was allowing contact between the minors and D.W., a registered sex offender and the father of A.A.; 2) mother was continuing in substance abuse treatment but her counselor reported some issues; 3) mother was incapable of keeping a safe home for the minors; and 4) mother had not been adequately supervising the minors.

Mother also raises challenges to the orders terminating parental rights. She first argues the court improperly sustained objections to questions posed to the minors' therapist on the grounds of privilege. She adds that the bonding assessment was incomplete and the court erred in failing to require the evaluator to give additional testimony. Finally, she asserts that the evidence supports finding both the parent-child *and* the sibling relationship exceptions to termination of parental rights. We disagree with all of these contentions; accordingly, we shall affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

We provide in this section an overview of the facts developed in the juvenile court as well as the proceedings in that court. We supplement our overview as needed to address mother's claims in detail in our Discussion, *post*.

---

S.A., and L.A., who are collectively referred to as "the minors" unless individual reference is necessary.

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

*Prior History of Removals*

The minors' oldest sibling, B.C., was temporarily removed from mother's custody in 2003 following mother's arrest for burglary. In 2008, the Shasta County Health and Human Services Agency (Agency) filed a petition to remove B.C., then age seven; C.A., age two; and S.A., age one, from mother's custody due to an unsafe home and mother's methamphetamine use. The minors tested positive for methamphetamine at that time. L.A. was born in 2009 and placed with mother under a family maintenance plan. B.C., C.A., and S.A. were returned to mother's care in July of that year. That dependency was terminated in February 2010.

*Current Dependency Case -- Through Termination of Services*

In June 2010, B.C. (age eight), and the minors (C.A., age four; S.A., age two; and L.A., age one) were removed from the home due to mother's ongoing drug abuse and hazardous living conditions. The court ordered reunification services for mother in October 2010. In December 2010, mother acknowledged she was pregnant and identified the father as D.W., a registered sex offender. A condition of D.W.'s parole was no contact with children. During this period mother was engaged in a drug treatment program at the Redding Rancheria which required her to have daily contact with her counselor. Mother gave birth to her fifth child, A.A., in May 2011. A week later a non-detaining petition was filed and A.A. remained with mother under a family maintenance plan with a no-visitation order for D.W. based on his parole condition. D.W. was in prison at least from June 2011 to June 2012 for a parole violation.

By the 12-month review hearing in August 2011, mother had made substantial progress and the court ordered further services.

In November 2011, mother was ordered to complete Proposition 36 drug treatment as a result of her criminal conviction for possession of drugs. The status report in December 2011 described a home visit between the minors and mother in November 2011 and noted the Agency's concerns about mother's ability to supervise the five

children.  Mother had completed a 12-week session of drug treatment in October 2011 and enrolled in an additional 12-week session beginning in November 2011.  In December 2011, the court ordered the minors placed with mother under a family maintenance plan.

The family maintenance review report filed in May 2012 recommended further services.  Mother continued to have difficulty supervising the minors with reported incidents of mother leaving them, now ages six, four, and two, alone in the car with the motor running, and letting them wander unsupervised in the neighborhood.  There was concern due to the increase in reports of neglect from several sources.  In response, the Agency increased the frequency of in-home services and instituted a wraparound program to help mother maintain structure and stability.  S.A. was displaying sexualized behaviors and she and the other minors were in family counseling.  Mother was testing negative and making progress in family therapy, in-home parenting and her drug treatment program, although the report concluded mother continued to have issues with neglect and supervision.

On June 18, 2012, the Agency filed a supplemental (§ 387) petition and the court again ordered the minors detained.  The petition alleged in summary that:  1) mother was allowing contact between the minors and D.W. despite Agency instructions and court orders prohibiting contact; 2) mother was not compliant with her substance abuse treatment because she failed to make the required contact with her counselor and consistently attend the program; and 3) there were ongoing issues with the condition of mother's home and she needed prompts from service providers to maintain it in a clean and safe condition.  The report for the section 387 petition recommended removal of the minors and termination of services for mother.

The juvenile court held extensive hearings on the section 387 petition from August 2012 through January 2013.  On February 22, 2013, the court sustained the three allegations pleaded in the petition with minor amendments, added a fourth allegation

4

(failure to maintain appropriate supervision of the minors) to conform to proof, and sustained the petition as amended. The court adopted the recommended disposition of termination of services and set a section 366.26 hearing as to the minors.

*Current Dependency Case -- After Termination of Services*

In June 2013, the court granted mother's request for a bonding study assessing both the parent/child bond and the sibling bond.

The Agency assessment for the section 366.26 hearing was filed in September 2013 and recommended termination of parental rights for the minors. Mother was unable to adequately supervise the minors during visits, and the visits affected the minors' anxiety levels. C.A. and S.A. occasionally refused to go to visits. Consequently, mother's visitation had been reduced. The minors had been in the current placement since July 2012 and were likely to be adopted in a reasonable time by the current caretakers. The bonding study was complete and concluded it would not be detrimental to the minors for them to be in a permanent placement away from their mother.

In November 2013, mother filed a petition for modification seeking to change the minors' placement from foster care to relative placement with a maternal aunt and uncle. A second addendum report recommended denial of the petition for modification. The Agency contacted the minors' therapist, Adam Hilton, to provide a letter containing his opinion on the proposed placement change. The resulting letter was attached to the addendum.

The bonding evaluation by Dr. McKellar, clinical psychologist, was also attached to the second addendum. McKellar's report thoroughly detailed his observations of the minors' interactions with their mother as well as with each other. McKellar found neither a significant parental bond nor a significant sibling bond beyond that between the minors (C.A., S.A., and L.A.).

The combined hearing on mother's petition for modification of the minors' placement and on the selection and implementation issues was held in November and

December 2013.  The parties called multiple witnesses, including Dr. McKellar, who testified about his bonding assessment.

Adam Hilton was called to testify about the letter he wrote regarding the effect a change of placement would have on the minors.  Both Hilton and minors' counsel invoked the psychotherapist-patient privilege, to which mother and others objected, but Hilton nonetheless provided limited testimony, which included that he had no opinion on whether a continued relationship between mother and the minors would be beneficial or whether never seeing mother again would have any impact on them.  Hilton also had no opinion on what effect severing the relationship between C.A. and S.A. and their two youngest siblings, A.A. and An.A., would have on C.A. and S.A.

The matter was continued and recommenced on May 14, 2014, when the court continued the placement issues, and limited the recommenced hearing to selection and implementation issues.[3]

After determining that none of the parties had any further evidence to present, the court deemed the section 366.26 issues submitted and adopted the recommended findings and orders terminating parental rights and selecting a permanent plan of adoption for the minors.

---

[3]  An issue arose as to whether the court required additional testimony from Dr. McKellar, who had been excused in December with an expectation that he would return and testify further before the selection and implementation issues were decided.  Agency counsel represented that the parties had been unable to agree on a stipulation as to additional testimony from Dr. McKellar, although the parties had submitted questions to the doctor and received answers.  Mother's counsel informed the court he felt a stipulation was inadequate and also (for the first time) objected that the bonding study did not include sufficient assessment of the sibling bond.  In discussing why mother felt the additional information was needed, mother referenced the pending placement issue.  The court indicated it would leave the placement issue pending, but that it had enough information to decide the other issues before it.  Mother did not move to continue the section 366.26 hearing to subpoena Dr. McKellar, or proffer additional evidence.

DISCUSSION

I

*Challenges to Order Terminating Services and Setting the Section 366.26 Hearing*

Mother first challenges the order terminating services and setting the section 366.26 hearing, which she previously raised in her petition for extraordinary writ. She argues the allegations in the section 387 petition were not supported by substantial evidence. "Subsequent appellate review of findings subsumed in an order setting a section 366.26 hearing is dependent upon an antecedent petition for writ review of those findings having been 'summarily denied . . . .' " (*Joyce G.*, *supra*, 38 Cal.App.4th at p. 1513; Welf. & Inst. Code, § 366.26, subd. (ℓ).) Because we summarily denied mother's petition, she retains "her appellate remedy (§ 366.26, subd. (ℓ)(1)(C)) but is limited to the same issue on the same record (§ 366.26, subd. (ℓ)(1)(B)) and thus is destined on appeal to receive the same result." (*Joyce G.*, at p. 1514.)

A. *Evidence Adduced at the Hearing on the Section 387 Petition*

As we noted *ante*, the juvenile court held a lengthy hearing regarding the allegations in the amended petition. We first relate key points from that testimony as relevant to our analysis of mother's claim.

### 1. Evidence of Contact with D.W.

The social worker, Crystal Adams, testified that D.W. had served prison time for unlawful sex with a minor, had parole violations for contact with minors, and a separate violation for a positive methamphetamine test in March 2011. D.W. completed parole in June 2012, however, the order denying visitation in A.A's case, based, in part, on his parole condition, remained active. Adams believed D.W. had not participated in sex offender treatment. S.A. and C.A. showed sexualized behaviors as early as February 2012, indicating they may have been exposed to sexual behavior. Before the petition was filed, Adams told mother about the risks to the minors of contact between them and D.W. (who was unrelated to them) and reminded her of the no-visitation order and that she was

not to permit contact between he and the minors. Adams said that mother denied any contact had occurred and said it was not an issue, but Adams believed mother violated the order based on her interviews with the minors and contacts in the community. Adams further testified that mother insisted she had done nothing wrong, which virtually admitted the contact. Mother told Adams she did not believe D.W. was a threat to the minors, but Adams had concerns based on his sex offenses and arrests for willful cruelty to children. Adams said she had no reason to doubt the minors' statements that they had contact with D.W. after his release from state prison.

### 2. Mother's Compliance with the Substance Abuse Program

Adams contacted Joe Ross (mother's drug counselor) on June 15, 2012, and Ross left a message for her that mother was not compliant with her program. Adams testified that, as of June 2012, mother was still in Proposition 36 treatment and was still participating, so her drug treatment was not complete. Adams said Ross had asked mother to re-enroll in the program and, in February 2012, wanted her to attend more meetings. Adams noted that mother had a history of relapse when supervision was withdrawn and did not think she could maintain a home for the minors in the long run. Adams's understanding was that mother's most recent drug treatment plan included daily contact with Ross but mother did not make the contact for over a week and was not in compliance with the plan. Adams said mother explained the missed appointments were due to Ross's illness, but Ross did not confirm that. Adams testified that Ross did provide conflicting information on whether mother was in compliance with his program and that mother had tested clean since October 2010.

Ross testified and agreed he reported to Adams in mid-June 2012 that mother was "MIA" from treatment and he had not seen her for weeks and had no contact with her in the previous week and a half.

### 3.      Condition of Mother's Home

Adams testified that mother had moved since the section 387 petition was filed and the petition addressed the conditions of her prior residence at Francis Court (transitional living). Adams had been there seven times in the nine months mother had lived there. Typically, the home was chaotic with clutter and choking hazards on the floor and mounds of clothes making the beds unusable. There were holes in, and writing on, the walls and dirty diapers on the floor. One would expect chaos with five children, but this was more than would be expected. Adams had discussed the importance of maintaining a clean home and being aware of choking hazards with mother, and mother also had the benefit of SafeCare in-home services which addressed the condition of the home. Mother had completed the SafeCare plan requirements, but Adams knew mother continued to get feedback from the SafeCare workers about ways to improve. Mother's response to discussion of the housekeeping issues was dismissive. In addition to the in-home services, Francis Court did weekly inspections and mother did not always pass.

Monique Taylor, assistant director at Francis Court transitional living, testified mother resided there from September 2011 to June 2012. The purpose of the facility was to get families ready to be living independently by adhering to a schedule and maintaining a routine. Taylor testified mother's home was cluttered most of the time with clothes and toys everywhere and there was damage to the residence. There was more clutter than would be expected, safety hazards were present, and mother was in violation of the tidy residence rule. Mother had several warnings, both verbal and written, about the state of her residence.

Jennifer Chaney testified she was mother's parent partner at the end of April 2012 for two or three weeks and had contact with mother at least three times a week. She was to help with parenting and support mother in finding solutions for family stability. Chaney met with mother seven to nine times at mother's home. The home was messier than it should have been even with five children. The home seemed chaotic with toys,

9

hair clips, and dishes on the floor. There were two small children in the home and Chaney discussed cleanliness and choking hazards with mother. Department of Correction clothes were found in the home, when asked if they were D.W.'s, mother said they were old and that she was going to sell them on eBay, but Chaney did not find her credible on that point. Chaney said she stopped meeting with mother because mother did not return her calls.

### 4. Lack of Supervision

Adams identified three incidents of lack of supervision reported after the beginning of the family maintenance period in December 2011. Adams agreed the referrals were unsubstantiated but was concerned because there was a pattern and the reports were from three different sources about mother's failure to supervise the minors. Adams stated that the minors were less reactive in foster care than they had been with mother. Currently, mother's visits were supervised, in part, because the visit supervisors had to frequently intervene in the visits to control the minors.

Taylor had observed the minors playing outside unsupervised at Francis Court several times and had reports of mother's lack of supervision from staff and residents. She reminded mother more than once about needing to personally watch her children when they were outside. Mother became upset when Taylor spoke to her about it.

Chaney testified that when she first met mother at the Redding Rancheria health clinic, mother left the other children in the van while she attended to S.A. at the clinic.

### 5. Additional Services Available

Adams testified mother had participated in parenting and in-home coaching, completed a drug and alcohol assessment, and participated in Redding Rancheria drug treatment. Mother was also referred for a mental health assessment and a parent/child evaluation, participated in a wraparound program, visited the minors, and continued to test negative. No other services were available for her.

10

### 6. Mother's Testimony and Supportive Witnesses

Mother testified she entered the drug treatment program at Visions of the Cross and then moved to the Francis Court transitional housing. Mother explained that on the day C.A. and S.A. were unsupervised at the park, she had a migraine attack and when the girls came home from school she laid down and asked B.C. to keep an eye on the minors. Later, B.C. asked to take the minors to the park and mother "thought [she] told her no, but [B.C.] said that [mother] told her, 'I don't care.'" She saw nothing wrong with leaving the minors in the car unsupervised with the motor running.

She had been in 10 drug treatment programs and had relapsed a dozen times.

She was pregnant with her second child by D.W. She denied she had any contact with D.W. until he had been discharged from parole but she and the minors did have contact with him thereafter and prior to the minor's removal because he was no longer subject to parole conditions and was allowed to see A.A. Knowing his history, mother did not think D.W. was a risk to her children. Mother described her relationship with D.W. as "off and on" and that she broke off with him in November 2012 "pretty much for good."

Lauri Hayward, Redding Rancheria Tribe community services director, testified she believed mother could maintain sobriety if she had healthy people in her life. Hayward stated mother had low self esteem and unhealthy relationship issues. Hayward testified she would be concerned about mother maintaining her sobriety if mother were involved with a man convicted of unlawful sex with a minor and lewd and lascivious acts with a child.

Ross testified about mother's drug treatment program. He had sent mother to an inpatient program and she returned for outpatient treatment. The first 12 weeks included mandatory groups and a daily check in with him. Mother graduated to the second phase of treatment and mandatory check in was not required. Ross said mother had, to the best of his knowledge, maintained sobriety over the last two years.

B. *Analysis*

### 1. Contact with A.W.

Contact between the minors and D.W. was governed by D.W.'s conditions of parole and by the no-visitation order in A.A.'s case. The court's order was never modified. The evidence showed that mother was aware of the court order because Adams had repeatedly reminded her about it. Further, Adams had cautioned mother about the risk to the minors of exposure to D.W. because of his sex offender status and told her such contact was not permitted. Meanwhile, the minors were exhibiting sexualized behavior. Mother seemed indifferent to the risk D.W. presented, and even testified to her lack of concern. Although she testified they were broken up "pretty much for good," she was pregnant with his child at the time she testified. Ample evidence supported the allegation as sustained. (*In re Angelia P*. (1981) 28 Cal.3d 908, 924; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.)

### 2. Substance Abuse

The court modified the allegation to omit the portion which alleged mother's non-compliance with her substance abuse treatment. The allegation, as sustained, alleged mother was continuing with treatment but had issues in June 2012. The evidence showed that mother was continuing to participate in the Redding Rancheria program because she was subject to mandatory Proposition 36 drug treatment requirements. Further, Ross admitted mother's then-current lapses as Adams testified he had reported them to her in June 2012. The allegations as sustained were supported by substantial evidence. (*In re Angelia P*., *supra*, 28 Cal.3d at p. 924; *In re Jason L.*, *supra*, 222 Cal.App.3d at p. 1214.)

### 3. Condition of the Home

Mother argues that she produced testimony contradicting the Agency's evidence that she failed to maintain her home in a condition that was safe for her children. We do not reweigh the evidence when assessing the sufficiency of the evidence. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.) Conflicts in the evidence are to be

12

resolved in favor of the prevailing party and issues of fact and credibility are questions for the trier of fact. (*In re Jason L.*, *supra*, 222 Cal.App.3d at p. 1214; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16.)

Adams, Chaney, and Taylor all testified to deficiencies in mother's maintenance of her home, and that she was repeatedly warned and prompted to maintain the home in a clean and safe condition. The court resolved the conflicting evidence adversely to mother and ample evidence supported the allegation.

### 4. Supervision

Mother argued in her writ petition that the failure to supervise allegation was improperly added to the section 387 petition because there was no motion by a party to amend it. She does not renew that argument on appeal. In any event, because when the juvenile court announced its amendment to the section 387 petition, mother did not object on any ground she has forfeited any claim of impropriety in the court's action in amending the petition. (*In re Dakota S*. (2000) 85 Cal.App.4th 494, 501-502.)

Mother claims on appeal insufficient evidence supports this allegation. She did not make this claim in her writ. To the extent that mother's arguments on appeal relating to the petition for extraordinary writ differ from those in the petition, they are not cognizable. (*Joyce G.*, *supra*, 38 Cal.App.4th at p. 1514.)

### 5. Court's Findings

In sustaining the petition and removing the minors from mother, the juvenile court's primary concern was mother's lack of judgment. The court observed mother *seemed* to have control over her drug problem but observed she had not always been candid about it and questioned whether mother had actually maintained her sobriety. The court added that mother had not benefitted from services designed to provide her the skills to maintain a safe home for the minors. The court identified ongoing problems with the state of the home, mother's inadequate supervision of the minors, and her lack of

judgment in allowing them to be in potentially hazardous situations. The court also found mother lacked insight as to the individuals she allowed to be around the minors.

As we have outlined above, the evidence supported the court's conclusion that mother lacked judgment in allowing the minors to live in hazardous conditions and have contact with individuals who could place them at risk. Mother also lacked insight into her failings in judgment. Consequently, the minors remained at risk of physical and emotional harm in her care. The court did not err in sustaining the section 387 petition.

II

*Challenges to the Order Terminating Mother's Parental Rights*

A. *Hilton's Invocation of Privilege*

At the time of Hilton's invocation of privilege, mother objected, claiming Hilton was an Agency expert and counsel was unable to cross examine him fully. The court pointed out that Hilton was not an Agency expert; he was the minors' therapist, and their communications with him were privileged. The court invited briefing on the issue, but none was ever filed.

Mother now argues that the juvenile court erred in permitting Hilton to invoke the psychotherapist/patient privilege, thereby denying her rights to confront and cross-examine him, and establish facts supporting exceptions to termination.

As we noted *ante*, the Agency contacted Hilton for his opinion on mother's request for *placement change* from the foster mother to the aunt. Mother has appealed the *termination* orders, which do not address placement. The only issues germane to termination are whether the minor is likely to be adopted (*In re J.I.* (2003) 108 Cal.App.4th 903, 911) and, if so, whether termination would cause detriment under any of the statutory exceptions. (*In Beatrice M.* (1994) 29 Cal.App.4th 1411, 1416.)

Although mother posits that she could have possibly established facts supporting exceptions to termination if she were allowed to breach the privilege, the record does not support this assertion. Despite the invocation of privilege, Hilton *testified* that he had no

14

opinion on whether a continued relationship between mother and the minors would be beneficial, or whether never seeing mother again would have any impact on them, or what effect severing the relationship between the minors and their youngest half-siblings would have on them. His testimony in this area was already elicited, and does not support any exception to termination.

B. *The Completeness of the Bonding Assessment*

Mother argues that the bonding assessment was incomplete, and the court erred in failing to require Dr. McKellar to provide additional testimony after December 2013.

### 1. Background

As he set forth in his bonding assessment report, Dr. McKellar observed mother and the minors twice, on July 3, 2013, and on July 5, 2013. The first observation also included mother's two youngest children, A.A. and An.A. The minors showed some interest in the youngest children, but little affection and engaged in only brief interactions. There did not seem to be a significant bond between the minors and the two younger children. C.A. spent most of the observation away from mother, occasionally engaging McKellar but her primary connection was with S.A and L.A. C.A. showed signs of a diffuse attachment to mother and did not respond to mother's interactions consistently with a mother-child bond. S.A. showed a fair attachment to mother but no signs of overt affection and some signs of parentification. L.A. seemed somewhat disconnected from mother, but did accept her hugs. L.A. spent most of the observation bringing toys to McKellar and asking him to play with her, even trying to sit in his lap. She showed signs of a disinhibited attachment style. Mother was aware of L.A.'s behavior and made no comment to her even after McKellar would prompt L.A. to join the others. At no time was there any discord among the minors to get mother's attention.

The second observation on July 5, 2013, also included B.C. The observation was almost identical to the first in terms of activity and behaviors. B.C.'s presence did not change the atmosphere of the observation as she spent time helping mother facilitate

15

activities and did not initiate interactions with the minors.  Generally, the minors did not show a particularly close bond with mother nor did they seek out her attention on a consistent basis.  All of the interactions seemed activity-based with few signs of emotional connection or intimacy.

McKellar also observed the minors separately on July 23, 2013.  The minors spoke of the foster mother with affection and none expressed a desire to see more of their mother when given the opportunity to state such a request.  The minors were positive but detached when talking about B.C., as if speaking about an aunt rather than a sister.

McKellar reported that the purpose of his evaluation was to determine whether a permanent placement outside mother's custody would be detrimental to the minors and to consider the nature of the inter-sibling bond.  McKellar described mother as a person with little insight into her own issues who was unable to verbalize relapse triggers and who had only a vague plan to maintain her sobriety.  Further, mother's history and current associations indicated she had not grasped the impact of her choices on her children.  McKellar concluded the bond between the minors and the younger children was akin to that of cousins.  McKellar also noted the minors' tendency to show diffuse boundaries in mother's presence but better boundaries and a preference for the foster mother's attention when mother was not present.  McKellar concluded the minors demonstrated only a fair bond to mother and signs of disturbed attachment when mother was present and that continued out of home placement would not be detrimental to them. The minors' relationship to B.C. was more that of a nanny than of a sister while their bond to A.A. and An.A was lacking in depth and akin to what one would expect with a cousin rather than a sibling.

Dr. McKellar testified at the selection and implementation hearing on December 9, 2013, in a manner consistent with his report.  He testified he had seen nothing since the evaluation that suggested it would be detrimental to sever the parent/child bond.  He added that he was somewhat alarmed by mother's failure to set boundaries in the minors'

interactions with him, and that L.A.'s behavior suggested that when she is with mother, she is used to strange men being present and to mother permitting them to take care of her. There was no sign mother had any concerns about strange men taking over parenting her children and no semblance of boundary setting or recognition of what was happening. He did not see the minors so bonded to their siblings that separation would be something they could not overcome.

### 2.  Analysis

Mother first argues the bonding assessment was inadequate because there was no separate sibling assessment. Mother did not raise any objections to the methodology or contents of the bonding study until May 2013--six months after the report was disclosed. Even if her belated objection did not result in forfeiture of her claim (see *In re Christopher B*. (1996) 43 Cal.App.4th 551, 558; *In re Dakota S*. (2000) 85 Cal.App.4th 494, 501-502), her claim does not persuade.

Mother selected the evaluator and set the parameters of the assessment. The report was provided to the parties in November 2013. The assessment included Dr. McKellar's observations of the minors' interactions among themselves and their siblings. Based on his observations, McKellar concluded there was no significant parental or sibling bond. At no time did mother's counsel seek to commission a separate or expanded study. The assessment was sufficient.

Further, the record does not support a claim that the court dismissed the doctor and failed to require him to return, as mother argues. Rather, the court deferred additional testimony--if any--from Dr. McKellar until the pending placement hearing. All concerns raised by mother regarding additional testimony from the doctor related to sibling and family relationships in the context of mother's motion to change placement from foster to family. As to the section 366.26 hearing, mother did not move to continue the case to secure additional testimony from the doctor, nor did she proffer additional evidence. No error appears.

17

C.     *Relationship Exceptions to Termination*

Finally, mother asserts that the evidence supports finding both the parent-child *and* the sibling relationship exceptions to termination of parental rights.  Her claim is unsupported by the record.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]'  [Citation.]  If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child."  (*In re Ronell A*. (1996) 44 Cal.App.4th 1352, 1368.)  There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child."  (§ 366.26, subd. (c)(1)(B).)  The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights.  (*In re Cristella C*. (1992) 6 Cal.App.4th 1363, 1372-1373; *In re Melvin A*. (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(4); Evid. Code, § 500.)

### 1.     **Parent-Child Relationship**

Termination of parental rights may be detrimental to the minor when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  However, the benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging that a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the

18

natural parent's rights are not terminated." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575; *In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Even frequent and loving contact is not sufficient to establish this benefit absent a significant positive emotional attachment between parent and child. (*In re I.R.* (2014) 226 Cal.App.4th 201, 213.)

Although mother visited the minors regularly, the parent-child relationship did not outweigh the benefits to the minors of permanence and stability. The bonding study established that the minors did not see mother as a parental figure and mother did not act in a parental role. Mother did not set boundaries for the minors, minimized the significance of the minors' contacts with D.W., and rationalized her neglectful conduct which placed the minors at risk. Severing the relationship with mother would not deprive the minors of a substantial positive emotional attachment. The evidence showed that the minors' attachment to mother was not strong and that the relationship was not positive. Mother failed to establish that the beneficial parental relationship exception applied.

### 2. Sibling relationship

Termination of parental rights may also be detrimental to the minor when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) The court must consider the interests of the adoptive child, not the siblings in determining whether termination would be detrimental to the adoptive child. (*In re Daniel H*. (2002) 99 Cal.App.4th 804, 812-812; *In re Celine R*. (2003) 31 Cal.4th 45, 49-50.)

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be

19

detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952, fn. omitted.)

The bonding study concluded the minors had no strong bonds to B.C., A.A. or An.A., but were strongly bonded to each other. Much of the minors' lives had been spent in foster care with the current caretaker and their contact with siblings was limited to visitation. From the minors' point of view, the only significant family bond was the bond they had with each other. There is simply no evidence to show that the minors' long-term emotional interests are dependent on maintaining contact with their other siblings, or that severing the contact would cause detriment. Mother failed to show there was a significant relationship between the minors and their siblings.

The court properly concluded no exception to termination of parental rights had been established and did not err in terminating parental rights.

## DISPOSITION

The orders of the juvenile court are affirmed.


                                                       DUARTE         , J.


We concur:



     MAURO        , Acting P. J.



     HOCH        , J.

20